## 2015-1355

# United States Court of Appeals for the Federal Circuit

---

### TEXCHEM ADVANCED PRODUCTS, INCORPORATED SDN. BHD.,

PLAINTIFF-APPELLEE

*v.*

### E.PAK INTERNATIONAL INC.,

DEFENDANT-APPELLANT.

---

Appeal from the United States District Court for the Central District of California in case no. EDCV 12-01341 JGB (SPx) Judge Jesus G. Bernal

---

### CORRECTED BRIEF FOR APPELLANT E.PAK INTERNATIONAL INC.,

---

STEVEN SUSSER
DAVID J. GASKEY
CARLSON, GASKEY
& OLDS, P.C.
400 W. Maple Road, Suite 350
Birmingham, MI 48009

April 24, 2015                    *Attorneys for Appellant*

# CERTIFICATE OF INTEREST

Counsel for Appellant, e.PAK International Inc. certifies the following:

1.     The full name of every party represented by me is:

       e.PAK International Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

       N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

       ePAK Holdings Limited (HK incorporated)
       ePAK Technologies Limited (Incorporated in Cayman Islands)
       e.PAK Resources (S) Pte LTd (Incorporated in Singapore)

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

       Steven Susser
       David J. Gaskey
       CARLSON, GASKEY & OLDS, P.C.
       400 W. Maple Road, Suite 350
       Birmingham, Michigan 48009
       Telephone:   (248) 988-8360
       Facsimile:    (248) 988-8363

Scott Lieberman (appeared at District Court only)
SLATER HERSEY & LIEBERMAN LLP
18301 Von Karman Ave., Suite 1060
Irvine, California 92612
Telephone:  949-398-7500
Facsimile:   949-398-7501


Dated:  April 24, 2015                    By: /s/ Steven Susser
                                          STEVEN SUSSER
                                          DAVID J. GASKEY
                                          CARLSON, GASKEY & OLDS, P.C.
                                          400 W. Maple Road, Suite 350
                                          Birmingham, MI 48009

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ..................................................................... v

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT .................................................. viii

STATEMENT OF ISSUES ON APPEAL ............................................ 1

STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT
TO THE ISSUES ................................................................................ 2

    A.    The Parties ............................................................................ 2

    B.    e.PAK's Patent ..................................................................... 2

    C.    The Lawsuit .......................................................................... 7

    D.    Prior Art Raised at Trial ....................................................... 8

    E.    Evidence of Non-Obviousness with Respect to Claim 13 ................... 9

    F.    Evidence of Non-Obviousness with Respect to Claim 14 ................ 14

    G.    Evidence Related to Secondary Considerations................................ 16

SUMMARY OF THE ARGUMENT .................................................... 20

ARGUMENT ....................................................................................... 21

I.     STANDARD OF REVIEW .......................................................... 21

    A.    Standard of Review ............................................................. 21

    B.    Legal Standard for Obviousness Finding ............................ 21

II.    THE TRIAL COURT'S FINDING OF NONOBVIOUSNESS WITH
RESPECT TO CLAIM 13 WAS CLEARLY ERRONEOUS ..................... 27

III.    THE TRIAL COURT'S FINDING OF NONOBVIOUSNESS WITH
        RESPECT TO CLAIM 14 WAS CLEARLY ERRONEOUS ......................33

IV.     THE TRIAL COURT IMPROPERLY DISMISSED OR IGNORED
        THE SECONDARY CONSIDERATION EVIDENCE ..............................36

        A.      Commercial Success.............................................................36

        B.      Long Felt Need and Failure of Others to Make The Invention...........37

        C.      Skepticism ........................................................................38

        D.      Copying ...........................................................................38

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................39

# TABLE OF AUTHORITIES

## Cases

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120
(Fed. Cir. 2000) .........................................................................................37

*Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003) ....22

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387
(Fed. Cir. 1988) .....................................................................................38, 39

*Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000) ...........22, 36

*Finnigan Corp. v. U.S. Int'l. Trade Comm'n.*, 180 F.3d 1354 (Fed. Cir. 1999) .....35

*Ferring B.V. v. Watson Labs, Inc.-Fla.*, 764 F.3d 1401 (Fed. Cir. 2014) ...............21

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ...........................................23, 35, 37

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131
(Fed. Cir. 2004) .........................................................................................22

*In re Chaganti*, 554 Fed.Appx. 917 (Fed. Cir. 2014) .............................................31

*In re Clay*, 966 F.2d 656 (Fed. Cir. 1992) .......................................................23, 30

*In re Fine*, 837 F.2d 1071 (Fed. Cir. 1988) ...........................................................23

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) ...........................................................30

*In re Meng*, 492 F.2d 843 (C.C.P.A. 1974) ...........................................................26

*InTouch Techs., Inc. v. VGo Communs., Inc.*, 751 F.3d 1327 (Fed. Cir. 2014) ......29

*Indian Head Indus. v. Ted Smith Equip. Co.*, 859 F. Supp. 1095
(E.D. Mich. 1994) .......................................................................................38

*Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374 (Fed. Cir. 2005) ...............22

*Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381 (Fed. Cir. 2004) .....22

*KSR Int'l v. Teleflex Inc.*, 550 U.S. 398 (2007) .................................................*passim*

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339 (Fed. Cir. 2001) ................23, 35

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) ......38

*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011) ....................................22

*Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012)....................22

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285
(Fed. Cir. 2012) ........................................................................................................24

*Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989
(Fed. Cir. 2009) ........................................................................................................23

*Rambus Inc. v. Rea*, 731 F.3d 1248 (Fed. Cir. 2013) .............................................37

*Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968
(Fed. Cir. 2014) ........................................................................................................21

Transonic Sys. Inc. v. Non-Invasive Med. Techs., 75 Fed.Appx. 765
(Fed. Cir. 2003) ........................................................................................................22

*Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340 (Fed. Cir. 2000) ...................34

*W.L. Gore & Assoc. v. Garlock, Inc.*, 721 F.2d, 1553, 220 USPQ 303
(Fed. Cir. 1983) ........................................................................................................31

**Statutes**

35 U.S.C. §103 .................................................................................................21, 41

35 U.S.C. §282 ........................................................................................................22

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant e.PAK International Inc. states:

1.    There have been no prior appeals in or from the same civil action or proceeding in the lower court that have been previously before this or any other appellate court.

2.    Counsel for e.PAK is aware of no pending cases that would directly affect, or be directly affected by, this Court's decision in the pending appeals.

# JURISDICTIONAL STATEMENT

February 3, 2015 Judgment (Doc. #171) appealed from is final.

## STATEMENT OF ISSUES ON APPEAL

1.      Whether the trial court erred in finding claim 13 of the patent-in-suit obvious when (i) the District Judge used the invention of the patent, itself, as the starting point of the obviousness analysis; (ii) the record contains no indication of any reason to modify the prior art in a way that would provide the combination set forth in the claim; and (iii) secondary consideration evidence supports a finding of non-obviousness.

2.      Whether the trial court erred in finding claim 14 of the patent-in-suit obvious when (i) one of the claimed limitations is completely missing from the prior art; (ii) the District Judge relied upon the inventive process by which the inventors came up with the claimed invention against them to justify finding a reason to make the claimed invention when the record contains no evidence of a reason; and (iii) secondary consideration evidence supports a finding of non-obviousness.

## STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT TO THE ISSUES

### A. The Parties

Defendant/Counter-Plaintiff/Appellant e.PAK International Inc. ("e.PAK") designs, manufactures, and sells silicon wafer containers. e.PAK obtained a patent on its wafer container, United States Patent No. 6,988,620 (the '620 patent). A16-A24, A32-A33.

Plaintiff/Counter-Defendant/Appellee Texchem Advanced Products, Incorporated SDN.BHD ("TXAP") also sells and manufactures silicon wafer containers. When e.PAK accused certain TXAP products of infringing on the '620 patent, TXAP filed an action for declaratory judgment that TXAP does not infringe. Complaint p. 3-4. e.PAK counterclaimed for patent infringement. Answer p. 5.

Following a bench trial, Judge Jesus Bernal entered judgment in TXAP's favor, finding that the two patent claims at issue were invalid due to obviousness. This appeal followed.

### B. e.PAK's Patent

Silicon wafers are thin disks made from silicon that are used to create micro-processing chips such as those used in smart phones. A236. These wafers may have raised portions that are created when the electronics are imprinted onto the wafer. A245. During the transport of a stack of wafers, the wafers may move

laterally and vertically if they are not properly secured; this movement, in turn, may damage the wafers as they rub against each other. A238. As wafers are valuable, the industry tries to minimize transport-related damage. A244.

In 2002, e.PAK's customer, Texas Instruments, asked e.PAK to solve a problem with the separator pads Texas Instruments was using between the wafers stacked in containers. A83. Specifically, the separator pads that Texas Instruments used were leaving tiny particles on the wafers; Texas Instruments considered the continued presence of these particles to be unacceptable. A33, A34.

Texas Instruments asked e.PAK to find a way to improve the separator material to address the problem. A33. Notably, Texas Instruments did not propose an alternate container or even recognize the real reason why the particles were contaminating the wafers. A33-A34.

e.PAK's Jim Thomas and Clif Haggard began working to solve the problem. During their analysis, Mr. Thomas and Mr. Haggard arrived at a completely different approach than that being pursued by Texas Instruments. A36. Instead of focusing on alleviating the symptoms (separator pad debris), they determined what was the root of the problem, which was that the separator material was being sheared during relative, side-to-side movement of the wafers. It was not the separator material but the ability of the wafers to move laterally and vertically within the closed wafer container that was the real problem. A35, A64-A65. So,

Mr. Thomas and Mr. Haggard, after discovering the problem to be solved, focused on reducing this movement. A36-A37.

They wanted to try to end the shearing and other related problems by providing a more secure lateral and vertical containment of the wafers in the canister. A36-A37. To do this, they discarded the previously dominant container and reimagined the containment system as a whole. A36-A37.

Instead of using a base with static sidewalls to hold the wafers, they decided to use a base that closed in around the wafer stack once the wafers were set within the container. A38. To do this, they developed a dynamic container action in which the lid would cause the lateral walls of the bottom to move inward to reduce the inside dimension of the container to create lateral security for the wafers as the lid was placed onto the base. The sidewalls would thus provide lateral containment and the latching of the top piece to the bottom would provide vertical containment. A50-A51. Once the lid and bottom were connected, the invention would hold the wafers laterally and vertically for containment that was secure in two directions (up-and-down and side-to-side). A61-A62. No other wafer container manufacturer had ever accomplished this total encapsulation. A43-A44.

Mr. Thomas and Mr. Haggard worked with their colleagues at e.PAK in 2002 to develop this concept. A37, A894 (CA3). They filed a provisional patent application on September 6, 2002 and a non-provisional application on March 11,

2003. A32-A33, A16. The United States Patent and Trademark Office issued a patent for that invention on January 24, 2006. A32-A33, A16.

Beginning in 2003, e.PAK began selling a reduced movement horizontal wafer canister, called "eLX," that was covered by Claims 13 and 14. A52-A56; A46, A900. That is, the eLX canister embodied both the lateral containment feature of the converging sidewalls and the vertical containment feature of the locking mechanism at four corners of the container. Figure 2 of the '620 patent and a photograph of e.PAK's eLX commercial embodiment are provided here.



This lawsuit involves two claims from the '620 patent, claim 13 and claim 14. Claim 13 depends from claim 9, which describes a container with top and bottom portions that provides enough clearance around the edges of the wafers to

place them into the container in a first (open) condition and reduces the inside dimension of the container in a second (closed) condition to reduce such clearance for restraining lateral movement of the wafers in the container when the two portions are brought together. The bottom portion has a first endwall and a space bordered by a "restraining portion" where wafers are stacked on top of another while the container is open (in the "first condition"). As the container is closed, the inside dimension of the container provided by the restraining portion is reduced, creating a snug fit on the wafer stack. Here is the language of claims 9 and 13 (A23-A24):

> A container, comprising;
> a first endwall;
> a restraining portion having one end near the first endwall, the restraining portion establishing a first inside dimension near the first endwall and having a second, larger inside dimension near a second end of the restraining portion that is spaced from the first endwall when the container is in a first condition;
> a reducing portion that cooperates with the restraining portion to reduce the inside dimension near the second end from the second dimension to the first dimension·
> and '
> a second endwall near the second end of the restraining portion.

> The container of claim 9, including locking members extending away from the first endwall and receivers associated with the second endwall, the locking members having ends that are at least partially received by the receivers such that the first endwall and the second enwall are spaced apart and locked together with the restraining portion extending across at least part of the spacing between the endwalls.

Claim 13 includes locking members on the bottom of the canister and receivers (or slots) on the top so that the two portions of the canister will fit securely together on closure. Figure 1 is a top view of the commercial embodiment of claim 13 showing the ends of locking members cooperating with the receivers to hold the container closed.

Claim 14 is more specific than claim 13 and includes the requirement of the first endwall being rectangular, four locking members (one in each corner of the first endwall), an opening (in the first endwall) adjacent each locking member, and a further requirement that at least two of the four openings (adjacent the locking members) be partially blocked by a cross member. Here is the language of claim 14 (A24):

> The container of claim 13, wherein the first endwall is generally rectangular with the locking members near each of the four corners of the first endwall and the first endwall has openings adjacent the locking members, at least two of the openings being partially blocked by a cross member.

## C.    The Lawsuit

On August 13, 2012, TXAP sued e.PAK in a declaratory judgment action for a finding that TXAP's wafer shipper canisters do not infringe e.PAK's patent. Complaint p. 3-4. e.PAK responded with a patent infringement counterclaim on September 10, 2012 in which it claimed that TXAP's reduced movement

horizontal wafer shipper products that include a restraining portion and other elements of e.PAK's patent claims infringed e.PAK's patent. Answer p. 5.

**D.    Prior Art Raised at Trial**

During a six day bench trial, the trial judge, Judge Bernal, considered whether the accused products infringed claims 13 and 14 of the '620 patent and if those claims were invalid due to obviousness.

TXAP argued that the claims were obvious based on prior art. Specifically, TXAP asserted that claim 13 was obvious in light of U.S. Patent No. 5,909,812 to Thibaudeau (the "Thibaudeau patent") combined with U.S. Patent No. 6,341,695 to Lewis (the "Lewis patent"). A807-A813, A793-A806. The Thibaudeau patent and a related application from which the Lewis patent claims priority (both contain the same specification and drawings) were considered by the examiner during the prosecution of the '620 patent. A16 The Thibaudeau patent discloses a box for shipping lead frames. The Thibaudeau patent describes an elongated rectangular box with posts that are supposed to move inward (at least near one end) to bring the ends of the posts closer to the lead frames when the lid is releasably secured to the base.[1] Unlike the '620 patent, the Thibaudeau device is not secured by slots and

---

[1]    While there was a dispute in the lower court over whether the Thibaudeau patent sufficiently teaches reducing an inside dimension of its lead frame box because that which is mentioned in the description is not shown in the drawings referenced in that description, that issue is not on appeal.

latches, it is held together by a "friction fit" connection around the entire periphery of the interface between the top and bottom of Thibaudeau's box.

As for the Lewis patent, it discloses a container with two halves into which wafers are stacked. The container disclosed by the Lewis patent is held together by two latches.

## E.     Evidence of Non-Obviousness with Respect to Claim 13

Both Mr. Haggard and e.PAK's expert, Robert Kimmel, testified that the use of a locking member on a wafer canister generally was not new[2]. A96, A506-A507. But both also testified that the existence of locking members in the art did not make obvious the decision to use a latch-type locking member together with the reduced movement canister claimed in Claims 13 and 14. A152, A415.

Mr. Haggard testified that e.PAK's objective was to reinvent the entire concept of wafer protection by starting from scratch. A154. He stressed that his goal in developing the versions of his invention described by Claims 13 and 14 was to make a unified encapsulation system that provided both lateral and vertical protection for its fragile contents. A64-A65. Until that point, he said, there had not been a canister that provided this complete protection. A59.

---

[2]     Indeed, both were familiar with the Lewis patent, which demonstrated the use of a latch-type lock with a receiving slot on a wafer canister. A96, A506-A507, A793.

Mr. Haggard pointed out that e.PAK could have made a version of its reduced movement line of products without a latch-type locking member. A41. Mr. Haggard noted that the canisters are typically placed in a vacuum-sealed plastic bag for shipping so that locking members are not necessary. A171. He said that before arriving at the latch-type locking member claimed in Claim 13, e.PAK considered several other means of joining the two portions of the canister. A157. One method was to create a friction fit between the restraining portion on the base and the reducing portion on the lid to hold the two pieces of the canister together. A41. Another possibility for connecting the canister was through the use of zip ties. A67-A68.

Dr. Kimmel also testified as to the non-obviousness of claims 13 and 14. Dr. Kimmel opined that one of ordinary skill in the relevant art would have the following characteristics: A person who had the knowledge and skill to design plastic containers and had the skill to apply that knowledge to plastic containers for wafers and knowledge of the challenges faced by a designer of containers for items such as silicon wafers. A412-A414.

As to claim 13, Dr. Kimmel pointed out that to start an obviousness inquiry by using claim 9 would be to use improper hindsight. A562. This is because claim 9 is not prior art to claim 13 since, at the time of the invention of claim 13, claim 9 had not already been invented. The proper mode of inquiry into obviousness, he

added, would be to start with Thibaudeau. A562. Dr. Kimmel thus examined

whether it would have been obvious to one of ordinary skill in the art as of 2002 to

add a locking member to Thibaudeau. Dr. Kimmel opined that a wafer canister

designer in 2002 who knew of the Thibaudeau reference would not have thought to

add a locking member to that design. A562.

One reason for this was that the addition of a latch to Thibaudeau would not

have been considered necessary.



FIG. 1

Dr. Kimmel noted that the

Thibaudeau patent itself teaches

that the top is "releasably secured"

to the bottom.       A500, A808.

Indeed, he added, the concept of a "releasably secured" top is a major component

of the Thibaudeau invention. A419, A812. This, he testified, would indicate to one

of ordinary skill in the art that the lid could be both connected to the bottom and

released through a friction fit. A416-A420. Because of this "releasably secured"

connection, a person of ordinary skill in the art who knew of Thibaudeau in 2002

would not have thought to add latches and slots to the Thibaudeau device, much

less find it obvious, said Dr. Kimmel. A562.

Dr. Kimmel added that for the Thibaudeau reference, a friction fit would be

superior to a latch fit—rendering it counterintuitive for one of ordinary skill to add

11

a latch mechanism to Thibaudeau. A419-A420; A422. Since the Thibaudeau design was intended to be releasably secure without a latch, a latch would be superfluous. A421-A422.

One ordinarily skilled in the art would not add latches and slots to the Thibaudeau invention for very practical reasons. Dr. Kimmel testified that designing latches and slots into Thibaudeau would increase the cost of the container—again, for no appreciable gain. A422. The addition would make opening and closing the container more difficult. A216-A217. According to Mr. Haggard, e.PAK's customers had a strong negative reaction to adding latches because it made the opening and closing process more difficult for the canister operators. A216-A217. Mr. Haggard added that by including a receiving slot to the lead frame box of Thibaudeau, a person of ordinary skill would be making it more likely that contaminants would infiltrate the canister, causing risk of damage to items inside the box. A156-A157.

Because of the forces counseling against adding a latch/slot mechanism to Thibaudeau, Dr. Kimmel concluded, there was no reason for a person of ordinary skill in the art to add this mechanism to Thibaudeau. A422.

Even TXAP implicitly conceded that it would not be intuitive to add latches to Thibaudeau. According to James Pylant, TXAP's Vice President of Engineering, latches have to be carefully placed on a container to avoid interfering with wafer

12

loading equipment. A747-A748. This potential for interference is another negative of using a latch to secure the two pieces of the canister. One of Mr. Pylant's own patents claims a shorter latch as a way of avoiding such potential interference. A747-A748, A814. TXAP offered no evidence or explanation regarding how latches could be added to the lead frame box of Thibaudeau without introducing such potential interference or without significantly redesigning the Thibaudeau box.

TXAP's expert, Fred Smith, opined that Claim 13 would be obvious because a person of ordinary skill in the art would know about latches and would think it common sense to place latches on a lead frame box like Thibaudeau. A577. That is, it would be "obvious to try" latches on a Thibaudeau box. In Mr. Smith's words, "[a]nd the latches are so ubiquitous that I really don't even need a reason to combine them." A601. Mr. Smith said that the locking member/receiver connection method would be better than the friction fit method but did not explain the reason why a person of ordinary skill in the art would use a locking member instead of the friction fit described in Thibaudeau, other than to say that a locking mechanism was "better" than friction fit. A597.

Mr. Smith's testimony was based on his assertion that a friction fit connection would not be secure without becoming so tight that the container could not be opened by hand. A594-A595, A662-A663. But that position contradicts the

express teachings of the Thibaudeau patent, which say that the top is releasably secured to the base. A812. Mr. Smith did not provide any explanation of how or where latches would be included in a hypothetically modified version of the lead frame box of Thibaudeau. A579-A580. Nor did Mr. Smith address the several disadvantages of a locking member connection identified by other witnesses, such as the greater likelihood of contamination, the greater complexity and cost of a locking member, and interference with loading mechanisms. Finally, Mr. Smith did not explain why – if the locking member were so obvious – no one had thought of applying it to a reduced movement container before e.PAK did with its eLX product.

## F.    Evidence of Non-Obviousness with Respect to Claim 14

When e.PAK introduced its eLX canisters, there was no four-latch canister on the market; rather, the available canisters had two latches. e.PAK thought the four-latch solution would be better because a two-lock system could cause an imbalance by which only two of four corners of the container were secure. A61-A62. A two-latch container was thus more prone to partially opening or perhaps even completely separating. A61-A62.

But loading equipment misorientation also became a more complicated problem with introduction of a four-latch container. Loading equipment designed to accept a two-latch design included features to orient the canister in the loading

equipment so that two of the four corners align with correspondingly configured members on the loading equipment. The introduction of a four-latch container, which first occurred when e.PAK began manufacturing the eLX containers, allowed for misorientation because the four corners of the container base were all the same once the four locking members of e.PAK's invention were present. With a square shape to the base and four essentially identical corners, it was no longer possible to rely on the way loading machines and prior containers were designed to ensure proper placement. If the container bottom is not properly oriented, the machinery will not be able to load the container and, worse, expensive wafers may be damaged. A59-A60. e.PAK's solution to the potential orientation problem—disclosed for the first time by e.PAK after inventing the container of claim 14—was to at least partially block two of the four corner openings with cross members so that a machine operator could only position the canister at the desired orientation. A165.

Significantly, TXAP did not present a single piece of prior art showing a cross member or partially blocked openings on a wafer container. A423. TXAP tried arguing that circle and triangle imprints on the Lewis patent were a cross member, but e.PAK demonstrated that the triangle was a recycling indicator and the circular mark was a date stamp. A101, A793,A77-A78, A793, A860, A862. There is no record evidence of any analogous prior art showing a cross member or

its equivalent as recited in claim 14. A676-A678. Even TXAP's expert, Mr. Smith, did not offer any opinion or testimony that Claim 14 was obvious. A611, A618.

On the other hand, e.PAK's expert, Dr. Kimmel, opined that Claim 14 was not obvious over the prior art. He did not see any prior art that described two partially-blocked openings, much less any suggestion to combine some prior art with the Thibaudeau patent. A414. The box of the Thibaudeau patent has two sides much longer than the others so that it is plain to see in which direction the base would be placed on any loading equipment (assuming such equipment would be used although there is no evidence of record to support such an assumption) to achieve a desired alignment. Given that, no additional measures would be necessary. TXAP's expert conceded this point. A666-667

## G.    Evidence Related to Secondary Considerations

Objective evidence of the actual marketplace setting of the invention is called "secondary considerations." This is evidence that is based on the use of the patented invention and gives reason to believe that it would not have been evident to one of ordinary skill in the art to combine two or more prior art references to satisfy the applicable claim limitations. The evidence can include the following types of information: commercial success of products covered by the patent claims, a long felt need that was met by the invention, the failure of others to make the

invention, copying of the invention by others, and skepticism as to its likely success.

Until 2003, when e.PAK introduced its '620-based eLX design, no company had ever offered a reduced movement silicon wafer canister with the features of claim 13 or 14 despite the fact that there was a need in the market for a wafer container that secured the wafers both laterally and vertically. A61-A62, A238-A243. The prior art relied upon by TXAP's expert as a basis for his opinions recognized such a need and yet it went unmet for over a decade until the invention of the '620 patent came on the scene. After e.PAK's introduction and until 2011—when TXAP launched its competing product—no other company offered a reduced movement silicon wafer canister with the features of claim 13 or 14. A247, A248-A249.

TXAP's own expert implicitly conceded that there was a long felt need for e.PAK's invention. He cited to several patents dating back to 1993 that discussed the need to securely hold the wafers within a horizontal wafer canister. A667-A668, A866. Yet no one tried the solution of claim 13 or 14 until e.PAK. Before e.PAK's invention, the attempted solutions were directed toward increasing the vertical pressure on the wafers using additional cushions on the top and bottom of a wafer stack or other container modifications. A16. Prior to e.PAK's advancement, side-to-side movement was difficult to limit using a tighter side-fit

because there has to be enough inside clearance to allow for automated machinery to load and unload the wafers from the container. A36, A461, A16. Additional clearance between the inner walls of the container and the wafer-stack was useful for getting wafers in or out of the container, but would leave undesirable room for the wafers to move laterally during shipment. A36, A16.

The invention of the '620 patent was the first to adequately address the lateral movement problem within a total containment system. A16, A63, A126. The solution provided by the invention of the '620 patent was a departure from solutions that suggested applying more pressure to the top and bottom of the stack; instead, the '620 patent taught the movement of the container inward toward the wafer stack using a dynamic interaction between the container base and cover. A172, A16. Until the invention of the '620 patent, horizontal wafer containers were inadequate because they did not restrict lateral movement of the wafers within the container while at the same time vertically restricting movement through a secure latching system. A33, A63, A16.

Various individuals within the wafer container and semiconductor wafer industry were skeptical about whether the invention of the '620 patent would provide the protection that its inventors believed it provided. A242-A243. Texas Instruments did not believe that e.PAK's embodiment of the invention of the '620 patent would solve the problem that Texas Instruments was experiencing. Texas

18

Instruments believed that the problem could be solved with an improved separator material used between each of the wafers in a stack within a container. A33-A34. That skepticism was the justification Texas Instruments gave to e.PAK for not contributing toward the tooling needed to produce the eLX even though it was common practice in the industry for customers like Texas Instruments to make such a contribution. A243-A244. The President and CEO of e.PAK himself doubted that a product embodying the invention of the '620 patent would work or be accepted in the industry. A242.

From its introduction into the market, the eLX canister had revolutionary success—moving from about $31,000 in sales in 2003 to over $700,000 in sales less than two years later. A239, A864 (CA1). e.PAK's President, Steven Dezso, testified without challenge that the reason for this increase in sales was the reduced movement and latching features of the e.PAK canisters. A242-A243.

e.PAK also presented evidence of copying. In an internal email, TXAP employee Chris Mack wrote the following to TXAP Vice-President Jim Pylant: "I believe we should: Match the Epak base LxW and scale down our 200mm. Match the ID height with Epak. *4 clips same as Epak*." A749, A865 (CA2) (emphasis added). This shows industry recognition of the four locking member container as an e.PAK design and an attempt by TXAP to match certain eLX features, including the same four "clips" as used by e.PAK.

Although he did not render an opinion on the issue of infringement, Judge Bernal recognized that TXAP incorporated or copied the relevant features of e.PAK's commercial embodiment of the invention of the '620 patent. "The e.PAK and TXAP containers … resemble each other at a general level." A882. "The e.PAK '620 container and the TXAP container are nearly identical in function, if not form." A884.

TXAP did not present any evidence to challenge secondary considerations of non-obviousness. A577.

## SUMMARY OF THE ARGUMENT

The only evidence at trial demonstrated that there was no reason why one of ordinary skill in the art would have modified the Thibaudeau reference by adding the Lewis latches to meet the limitations of claim 13. Nothing in the prior art made that combination logical. Indeed, the Thibaudeau friction fit counseled against the latches – which would have added cost and complication to the Thibaudeau containment approach.

In its decision, the trial court tried to avoid this issue by using claim 9 of the '620 patent itself as the primary reference and finding that one or ordinary skill would have applied the Lewis latches to claim 9. But this approach was improper in that it necessarily required a hindsight analysis based on claim 9, which was not prior art to claim 13.

As for claim 14, neither TXAP nor the trial court was able to cite even one piece of prior art for the cross-members that partially block the slots of claim 14. In the absence of any prior art, it was improper to find claim 14 to be obvious because at least one claimed element is completely missing from the prior art.

## ARGUMENT

## I.    STANDARD OF REVIEW

### A.    Standard of Review

Following a bench trial on the issue of obviousness, the Federal Circuit reviews "the trial court's ultimate legal conclusions *de novo* and the underlying factual findings for clear error." *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 974 (Fed. Cir. 2014). A factual finding is clearly erroneous if the Federal Circuit is "left with the definite and firm conviction that a mistake has been made." *Ferring B.V. v. Watson Labs, Inc.-Fla.*, 764 F.3d 1401, 1406 (Fed. Cir. 2014).

### B.    Legal Standard for Obviousness Finding

The trial court found both claims 13 and 14 to be obvious under 35 U.S.C. §103. The trial court used an incorrect legal standard, however; under the analysis blessed by the Federal Circuit, the trial court's conclusion is wrong. Specifically, the trial court used e.PAK's own patent as prior art to find that same patent obvious. This tautological approach has been condemned by the Federal Circuit

and thus cannot provide the basis for a finding of invalidity. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1374 (Fed. Cir. 2000).

Claims 13 and 14 are presumed to be valid. 35 U.S.C. §282.[3] To overcome this presumption of validity, the trial court was required to find, by clear and convincing evidence, that the claims are invalid based on the prior art. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011); *see also Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005). This is a heavy burden to overcome. *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1145 (Fed. Cir. 2004). And one that must be applied to each claim at issue, as invalidity is determined on a claim-by-claim basis. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1371 (Fed. Cir. 2003); *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1383 (Fed. Cir. 2004). The burden for proving invalidity is heightened when the prior art references were considered by the Patent Office during prosecution. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012); *Transonic Sys. Inc. v. Non-Invasive Med. Techs.*, 75 Fed.Appx. 765, 783 (Fed. Cir. 2003).

---

[3]   The fact that the trial court had previously found the independent claim from which claims 13 and 14 stem to be invalid does not change this analysis. Dependent claims, which must be considered as a whole, enjoy the same presumption of validity as independent claims, regardless of whether the independent claims from which they depend are valid. 35 U.S.C. §282(a).

To render a claim obvious, each limitation of that claim must be accounted for, either by a single reference or by a combination of references. *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1359 (Fed. Cir. 2001); *see also KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 408 (2007), quoting *Graham v. John Deere Co.*, 383 U.S. 1 (1966) (where the Supreme Court noted that obviousness is a question of law based on underlying factual inquiries, including ascertaining "the differences between the prior art and the claims at issue"). And the applicable references must be from "analogous art." *See In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992). Guiding principles to use when analyzing an obviousness challenge include:

1. The claimed invention must be considered as a whole.

2. There must be a reason that would have prompted one of ordinary skill in the art to combine the elements as the new invention does.

3. The prior art references must be viewed without the benefit afforded by hindsight.

*See*, e.g., *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398 (2007); *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

The trial court here did not follow the Federal Circuit's guidance because it impermissibly used claims 13 and 14 as an *ex post* road map to find examples of prior art—including from claim 9 of the patent—that satisfied certain claim limitations. *See In re Fine*, 837 F.2d 1071 (Fed. Cir. 1988) ("One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior

23

art to deprecate the claimed invention."). If this approach were allowed, most patents would be obvious because, at some level, all new inventions are based on features of old inventions. *KSR Int'l. Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

For this reason, the trial court should have treated the inventions of claims 13 and 14 as a whole, as contrasted to the actual approach used by the trial court which was to start with claim 9 of the patent as if it were prior art to the other claims and then treat claims 13 and 14 as simply adding "mere" additional features. *See e.g., Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1298 (Fed. Cir. 2012) ("[S]mall differences may produce a nonobvious advance and commensurate commercial success."). The proper obviousness analysis considers the inventions of claims 13 and 14, respectively, as a whole and does not hold e.PAK's own claim 9 against it during that analysis. The consideration of whether it was obvious to combine the elements of claim 13 or 14 must start with the Thibaudeau teachings -- not claim 9 -- and proceed from there without using e.PAK's inventive process or discoveries against it and without using improper hindsight based on what e.PAK's inventors realized and then taught for the first time.

Further, these "additional features" that the trial court dismissed as obvious



were actually significant and, when considered by a person of skill in the wafer container art, were not obvious. Testimony at trial supported the position that the wafer container art is crowded and that even small advances had resulted in patentable inventions. TXAP's own Vice-President of Engineering, James Pylant testified that he believed his inventions related to minor changes to wafer containers were not obvious, specifically referencing US Patent Nos. 8,286,797 (shorter latches), 7,918,341 (reduced overlap between sidewalls of a container base), and 8,109,390 (further reduced overlap compared to that in his '341 patent)., A722-A727, A734-A734, A736-A748, A829-A845, A846-A859, A814-A828. One example was his '797 patent with claims that differ from prior art containers only in that they recite a shorter latch, which according to TXAP's expert were ubiquitous in the art. A747-A748, A814. This shorter latch (identical in most respects to e.PAK's locking members shown in the '620 patent but only shorter by the amount shown at 76 in Figure 17 of Mr. Pylant's '897 patent) was considered by Mr. Pylant - a person of skill in the art - to be a patentable improvement to the art because a shorter latch would be less likely to interfere with the automated wafer-loading machine. A747-A748, A822. In other words, as the arm of the loading machine swings toward the canister to deposit the

wafer inside, a lower latch is less likely to block the swinging movement of that loading machine. A747-A748. These improvements, though seemingly small and simple (to someone *outside* the relevant field or one having the benefit of hindsight) should not be deprecated. As this Court pointed out, "simplicity, particularly in an old and crowded art, may argue ***for*** rather than against patentability. Progress in the crowded arts, usually made in small increments, is as important as it is in arts at the pioneer stage." *Id.* at 1298 (emphasis added).

In some technical fields, the types of improvements a person of skill makes may seem to be a relatively minor advance but that is not a reason to find the advance obvious. Rather, the opposite is true. *Id.* (citing *In re Meng*, 492 F.2d 843,848 (C.C.P.A. 1974) "[S]implicity, particularly in an old and crowded art, may argue for rather than against patentability. Progress in the crowded arts, usually made in small increments, is as important as it is in arts at the pioneer stage."). As noted by the court in *Outside*, "Such pragmatic considerations are better understood by artisans in the field, than by judges." *Id.* Mr. Pylant's testimony regarding the non-obviousness of the minor changes in his own patents demonstrates that the wafer container art is one such technical field and that an advance such as claim 13's version of e.PAK's total containment system is properly patentable and not obvious (even if one were to consider it a simple thing to add latches to the box of Thibaudeau's '812 patent - assuming that a reason for

doing so actually existed). If making a latch (a known element) shorter was not considered obvious by a person of skill in the art then using latches as an additional element that was not included in the Thibaudeau patent should not be considered obvious by someone without the required level of skill, yet that appears to be exactly what happened when the district court found claim 13's invention obvious.

## II.    THE TRIAL COURT'S FINDING OF NONOBVIOUSNESS WITH RESPECT TO CLAIM 13 WAS CLEARLY ERRONEOUS

 TXAP did not discharge its burden of proving claim 13 invalid by clear and convincing evidence.

First, the trial court utilized an improper test for obviousness. Judge Bernal's finding of obviousness hinges on his conclusion that "latches [create] a more secure and thorough closure, so it would have been obvious for a skilled engineer to try while seeking to build the ultimate containment system." A888. Essentially, the trial court applied an "obvious to try" standard here. The Supreme Court in *KSR v. Teleflex* held that the fact that a combination was obvious to try may show that it was obvious but only when there are a finite number of predictable solutions and a design need or market pressure to solve a problem. *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398 at 419-22.

Based on the facts at trial, there was no evidence of a finite number of possibilities nor of a design need. Importantly, the Thibaudeau box already had the releasably secure friction fit connection around the perimeter of the box so that no

latch or other connection was needed in that context. As noted, e.PAK's Clif Haggard testified that it was possible to do without latches on other containers. In addition to the friction fit method of keeping the two portions of the container together as applied by the Thibaudeau patent, some containers were encapsulated in vacuum-sealed plastic before shipping and that technique would hold the container closed. A171. Mr. Haggard further testified that there were possibilities other than latches for keeping the two portions of the container together. A67-A68. He added that the latch system presented some challenges that counseled against their application. For example, latches would make opening and closing the container more difficult, would add cost, and presented the risk of contaminant infiltration. A156-A157, A216-A217, A422.

Finally, there was no evidence of any market need for a latch system to be applied to the lateral containment concept described in claim 9 of the '620 patent. First of all, to say that it would be obvious to try latches with the container of claim 9 is to put claim 9 improperly into the prior art when it was not in existence prior to the invention of the '620 patent. The District Judge effectively said that it would be obvious to put latches on e.PAK's invention once they invented it, which is circular reasoning that is not proper during the obviousness inquiry. Stated another way, while the 'obvious to try' approach may be valid with the proper evidentiary

support, the trial court here made its finding without that support and, indeed, without any reference to any basis to support its 'obvious to try' conclusion. A881.

TXAP's expert on the issue of obviousness did not provide an articulated reason or rational underpinning for TXAP's proposed combination of the Thibaudeau patent with selected features of the Lewis patent. He only said that the latches of the Lewis patent were - at least in his opinion - ubiquitous and that he does not even need a reason to make the combination. Of course, to say that no reason for a combination is needed goes contrary to decades if not centuries of precedent on the issue of obviousness. Further, leaving the record void of any articulated rationale for modifying the box of the Thibaudeau patent prevented TXAP from sustaining its burden of proving claim 13 obvious by clear and convincing evidence. An assertion that a patent claim is obvious "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (U.S. 2007), *citing In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). Stated another way, there must be a finding that a skilled artisan would have been motivated to combine the prior art references to achieve the claimed invention and that this skilled artisan would have had a reasonable expectation of success in doing so. *InTouch Techs., Inc. v. VGo Communs., Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014). This legally required

reason mandated by the *KSR* decision is necessary to guard against improper hindsight when conducting the obviousness inquiry.

Additionally, a patent challenger cannot combine teachings of prior art references unless there would be some benefit flowing from the proposed combination. "If a person of ordinary skill in the art can implement a predictable variation, *and would see the benefit of doing so*, §103 likely bars its patentability." *KSR*, 550 U.S. at 401 (emphasis added). Without any benefit, however, the legally required reason for the combination is missing and there is no *prima facie* case of obviousness. The evidence of record does not provide clear and convincing proof that there would be a benefit to adding latches to the Thibaudeau box. Instead, as explained above, Mr. Haggard and Dr. Kimmel provided ample reasons why such a modification to the Thibaudeau box would be detrimental rather than beneficial.
In light of the Federal Circuit's obviousness jurisprudence, the trial court should have started with the base reference of Thibaudeau and articulated a reason why a person of ordinary skill in the art would have modified Thibaudeau's box with one or more pieces of analogous prior art to arrive at the invention of claim 13. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007), *citing In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ([T]here must be some articulated reasoning with some underpinning to support the legal conclusion of obviousness."); *see also In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992).

The trial court did not take this approach, however. In fact, the trial court did not use Thibaudeau at all for its analysis but only referenced the Thibaudeau patent one time in the fact section of its findings and not at all in the Conclusions of Law section. A885.

Instead of using Thibaudeau for its base or primary reference, the trial court used the commercial embodiment of claim 9 of the '620 patent as a starting point. That court then found that a person of ordinary skill in the art would have been aware of a two-latch closing mechanism such as the one found in the Lewis Patent ('695). As four latches are more secure than two, wrote the trial court, it would have been obvious to that person to try adding four latches to the container described in claim 9. A888. Essentially, the trial court described the inventive process undertaken by e.PAK that led to e.PAK's receiving the '620 patent; the trial court then found that this same inventive process invalidates claim 13 as obvious. This circular reasoning has been condemned by this Court. *In re Chaganti*, 554 Fed.Appx. 917, 922 (Fed. Cir. 2014) ("It is not enough to say that there would have been a reason to combine two references because to do so would have been obvious to one of ordinary skill. Such circular reasoning is not sufficient – more is needed to sustain an obviousness rejection."); *see also W.L. Gore & Assoc. v. Garlock, Inc.*, 721 F.2d, 1553, 220 USPQ 303, 312-13 (Fed. Cir. 1983) ("To imbue one of ordinary skill in the art with knowledge of the invention in suit,

when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.")

What the trial court should have done is to start with the base reference, Thibaudeau, and ask whether a person of ordinary skill in the art would have had a reason to combine the Lewis latch mechanism to the Thibaudeau reference. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (U.S. 2007). If the trial court had engaged in this type of analysis, it would have found that there was no reason to make the Thibaudeau-Lewis combination and that, indeed, there were reasons not to even try that combination.

There is no reason or motivation to add latches as shown in the Lewis patent to the container of the Thibaudeau patent because the latches would not provide any benefit in the context of the Thibaudeau patent. Since Thibaudeau already provides a way to releasably secure his cover to his base -- a friction fit around the entire perimeter -- latches would be redundant (or even obstructive) and would not add anything of any benefit. Therefore, the legally required reason for making TXAP's proposed combination is missing. Stated another way, TXAP's proposed combination cannot be made for purposes of attempting to render claim 13 obvious because there is no reason for making it. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (U.S. 2007).

There also is no reason or benefit because the latches of the Lewis patent would not address any potential problems in the context of the Thibaudeau patent. This is not a situation like the one in *KSR* in which both the problem was known and a solution needed. Rather, there was no connection "problem" with Thibaudeau and no one in the industry had even considered adding latches to the Thibaudeau design. *KSR Int'l. Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007) ("[A] patent claim is only proved obvious if…the knowledge of a person having ordinary skill in the art reveals motivation or suggestion to combine the prior art teachings").

The stated purpose of using four latches to provide "greater flatness" in the Lewis patent is of no concern in the Thibaudeau patent. The secure connection between the cover and the base of the Thibaudeau patent includes a connection along the entire periphery of the base and secures the entire length of each side of the cover to the corresponding surface on the base. There would not be any concern with flatness even if a larger sized cover and base were made according to the Thibaudeau patent because the secure connection around the entire outside edge of the base and cover already provides a way of maintaining a flat container. A807-A813.

Not only is there no benefit to TXAP's proposed combination, but the proposal could actually make the arrangement of the Thibaudeau patent less secure

because it would replace a secure attachment along the entire outside edge of the container with single-point latches. A patent challenger cannot attempt to render a claim obvious by suggesting a combination of prior art that actually detracts from what the prior art teaches. Instead, the suggested combination must result in an improvement. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 (Fed. Cir. 2000) (allegation that it was obvious to substitute one locking mechanism with another known mechanism was rejected because the substitution would result in a less secure arrangement instead of one that was more secure).

## III. THE TRIAL COURT'S FINDING OF NONOBVIOUSNESS WITH RESPECT TO CLAIM 14 WAS CLEARLY ERRONEOUS

The trial court's finding that claim 14 of the '620 patent was also clearly erroneous since there were no prior art references in the record that taught or suggested claim 14's combination. That claim recites a reduced movement container with four latches positioned in the container's corners, at least two of which have adjacent openings that are partially blocked.

Among the several problems with the trial court's treatment of claim 14, one stands out: There was no analogous prior art at all. Nothing. TXAP failed to proffer any evidence that the "cross members" of claim 14 were known prior to e.PAK's invention. It is impossible for TXAP to establish a *prima facie* case of obviousness without any evidence of the claimed "cross members" in the prior art because, without that, TXAP cannot establish that every element of claim 14 was

known prior to the invention of claim 14. Even the Lewis prior art reference, which noted the possibility of using four latches never made any mention about a cross member or any other means of blocking two of the four latches for purposes of alignment.

To render a claim obvious, each limitation of that claim must be accounted for, either by a single reference or by a combination of references. *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1359 (Fed. Cir. 2001); *see also KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 408 (2007), *quoting Graham v. John Deere Co.*, 383 U.S. 1 (1966) (where the Supreme Court noted that obviousness is a question of law based on underlying factual inquiries, including ascertaining "the differences between the prior art and the claims at issue").

Therefore, TXAP has not met the clear and convincing threshold required to invalidate claim 14. *See, Finnigan Corp. v. U.S. Int'l. Trade Comm'n.*, 180 F.3d 1354, 1364-66 (Fed. Cir. 1999). Given the complete absence of any cross members in the prior art that TXAP alleges invalidates claim 14, there is no way for TXAP to establish even a prima facie case of obviousness against claim 14.

In the absence of prior art, the trial court fabricated its own based on the invention of claim 14, itself, which is improper hindsight reconstruction. The trial court created the following syllogism:

1.  Mr. Haggard, e.PAK's lead designer and '620 patent inventor, solved the misalignment problem by placing cross members in the latch openings.

2.  Mr. Haggard is one of ordinary skill in the art.

3.  Therefore, someone else of ordinary skill in the art would have found it obvious to add cross members to two of the latch openings of e.PAK's container.

A888-A889. In a somewhat extraordinary reversal of longstanding Federal Circuit jurisprudence, the trial court used the inventor's own patented solution as a prior art reference to challenge that very invention. This was demonstrably improper. It is axiomatic that a court may not use one claim of the patent-in-suit as a prior art reference to find obviousness as to another claim of that same patent because the two claims are contemporaneous. In other words, an inventors' own discoveries in the course of inventing cannot be used against her as if they existed prior to those discoveries being made or invented. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1374 (Fed. Cir. 2000). It was particularly inappropriate for the trial court to find the cross members of claim 14 "inherent" when not one prior art reference contains any.  It was similarly improper for the trial court to say that Mr. Haggard's realization was not inventive - it was not until the concept of the four latch configuration of claim 14 was conceived that the problem Mr. Haggard and his co-inventors solved even existed.  Therefore, it was not inherent to one of skill in the art to solve a problem that did not previously exist in the art.

By finding obviousness in the absence of analogous prior art, the trial court effectively upended the burden of proof and required e.PAK to demonstrate that claim 14 was not obvious. This was a fundamental error. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1255 (Fed. Cir. 2013) (reversing Board of Patent Appeals finding because, in part, the Board erroneously placed the burden on the patent holder). A747-A748.

## IV.  THE TRIAL COURT IMPROPERLY DISMISSED OR IGNORED THE SECONDARY CONSIDERATION EVIDENCE

The obviousness inquiry involves certain "secondary considerations." These are not secondary in importance but are considered only after the patent challenger has established a *prima facie* case of obviousness. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 694 (1966). The secondary considerations at issue in this case are: Commercial success, long-felt but unresolved need, skepticism of experts, and copying by competitors. *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1129 (Fed. Cir. 2000). Each of these secondary considerations cuts against any *prima facie* case of obviousness that TXAP may have established.[4]

---

[4]  As noted above, TXAP (and the district court) failed to establish any possible prima facie case of obviousness against claim 14 at least because there is nothing in the record to show that the cross members of claim 14 were known prior to the invention of claim 14.

**A.    Commercial Success**: The success of a product is evidence that the idea was not obvious. *Indian Head Indus. v. Ted Smith Equip. Co.*, 859 F. Supp. 1095, 1105 (E.D. Mich. 1994) ("had the invention been obvious, inventors would have produced it earlier to reap the monetary rewards"). *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005) ("Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art"). Here, e.PAK's President, Steve Dezso, testified that his eLX line - a line of products that embody the inventions of claims 13 and 14 of the '620 patent - experienced astounding success with sales skyrocketing from about $31,000 in 2003 to $721,000 just two years later. As the successful commercial embodiment is the invention claimed in claims 13 and 14, e.PAK has established a nexus between the undisputed commercial success and the claimed invention. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent").

The district court improperly dismissed this evidence saying that e.PAK merely replaced one container with its eLX but that actually proves e.PAK's point.

Replacing an existing product on the market with the patented invention shows the value of the invention instead of somehow diminishing the commercial success.

**B.      Long Felt Need and Failure of Others to Make The Invention**: Another secondary consideration is a long felt but unresolved need in the industry. "The idea is that if the industry felt a need, yet failed to produce the innovation for a significant period of time, then the innovation must not have been obvious to those with ordinary skills in the art." *Id*. at 1103. TXAP's expert Mr. Smith testified that restricting wafer movement within containers was a well-known problem. The patents he relied on for that proposition show that the problem existed for as long as a decade before Mr. Haggard and his co-inventors developed the inventions of claims 13 and 14. Prior to e.PAK's patented total containment system, the wafer container industry had nothing that adequately restricted vertical and lateral movement of the wafers inside the container. A reduced movement container with latches that provided total containment was a need in the industry that had not been met until e.PAK's introduction of its eLX line of products.[5]

---

[5] The district court's suggestion that e.PAK's introduction of four latches gave rise to the need for the cross members of claim 14 does not negate the long felt need for the rest of the claimed invention and certainly not the long felt need that was met by the invention of claim 13.  Moreover, the district court here demonstrates an inconsistency by, on the one hand, saying that the problem solved by the cross members was introduced by e.PAK's innovation to negate any long felt need and, on the other hand, saying that solving that same problem would have been obvious to the inventors of that newly introduced innovation.

**C.    Skepticism**: Skepticism by experts is another secondary consideration. Here, Mr. Dezso testified that even he was skeptical at first that e.PAK's proposed total containment solution would work. A242-244. Mr. Haggard noted that Texas Instruments was likewise skeptical and needed to be convinced that the solution would work. A33-A34.

**D.    Copying**: As evidenced by an email written by one of the developers of the infringing TXAP products, when considering features of e.PAK's eLX containers or those of another competitor, he chose to follow e.PAK's lead and recommended copying the eLX. That email evidences copying including matching the e.PAK dimensions and using four clips like e.PAK, which were recognized by TXAP's designer as e.PAK's contribution to the industry. A865 (CA2).

Judge Bernal also recognized that TXAP incorporated or copied the relevant features of e.PAK's commercial embodiment of the invention of the '620 patent. "The e.PAK and TXAP containers … resemble each other at a general level." A882. "The e.PAK '620 container and the TXAP container are nearly identical in function, if not form." A884. The district court therefore, at least implicitly, found evidence of copying.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons stated in this brief clear and convincing proof of obviousness does not exist and the secondary consideration evidence points away from rather

than to a conclusion of obviousness.   Therefore, e.PAK requests that the Court

reverse the judgment of the trial court that claims 13 and 14 of the '620 patent are

obvious under 35 U.S.C. §103.


Dated: April 24, 2015                              Respectfully submitted,

                                                   /s/ Steven Susser_____
                                                   STEVEN SUSSER
                                                   DAVID J. GASKEY
                                                   CARLSON, GASKEY & OLDS, P.C.
                                                   400 W. Maple Road, Suite 350
                                                   Birmingham, MI 48009
                                                   (248) 988-8360
                                                   ssusser@cgolaw.com

# ADDENDUM TO BRIEF FOR APPELLANT

# ADDENDUM TABLE OF CONTENTS

Final Judgment (Doc. No. 171)...............................................................A15

U.S. Patent No. 6,988,620......................................................................A16

Findings of Fact and Conclusions of Law (Doc. No. 168)..................................A881

JS-6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEXCHEM ADVANCED PRODUCTS, INC. SDN. BHD | Case No. EDCV 12-1341-JGB (SPx) |
| Plaintiff, | **JUDGMENT** |
| v. | |
| E.PAK INTERNATIONAL, INC. | |
| Defendant. | |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

In accordance with the Court's previous orders in this matter and its Findings of Fact and Conclusions of Law entered on January 13, 2015, the Court orders that judgment be entered in Plaintiff's favor.

IT IS SO ORDERED.

Dated: February 3, 2015 _____

Jesus G. Bernal
United States District Judge

1

**A15**

(12) **United States Patent**
Haggard et al.

(10) Patent No.:     **US 6,988,620 B2**
(45) Date of Patent:        **Jan. 24, 2006**

(54) **CONTAINER WITH AN ADJUSTABLE INSIDE DIMENSION THAT RESTRICTS MOVEMENT OF ITEMS WITHIN THE CONTAINER**

(75) Inventors: **Clifton C. Haggard**, Austin, TX (US); **James R. Thomas**, Austin, TX (US); **Song Ping Chen**, ShenZhen (CN); **Ru Zheng Liu**, ShenZhen (CN)

(73) Assignee: **e.PAK International, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 434 days.

(21) Appl. No.: **10/386,385**

(22) Filed: **Mar. 11, 2003**

(65) **Prior Publication Data**

US 2004/0045263 A1    Mar. 11, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/408,850, filed on Sep. 6, 2002.

(51) **Int. Cl.**
**B65D 85/00** (2006.01)

(52) **U.S. Cl.** .................................................... **206/710**

(58) **Field of Classification Search** ................. 206/303, 206/701, 706, 710, 711, 714, 715, 722, 723, 206/724, 725
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,858,764 A | * | 8/1989 | Domokos | 206/449 |
| 5,240,753 A | * | 8/1993 | Tabuchi et al. | 428/36.4 |

| | | | | |
|---|---|---|---|---|
| 5,351,836 A | * | 10/1994 | Mori et al. | 211/41.18 |
| 5,402,890 A | | 4/1995 | Yajima et al. | |
| 5,476,176 A | * | 12/1995 | Gregerson et al. | 206/711 |
| 5,533,711 A | * | 7/1996 | Pickrell | 254/273 |
| 5,836,454 A | | 11/1998 | Evers | |
| 5,909,812 A | | 6/1999 | Thibaudeau | |
| 5,988,393 A | * | 11/1999 | Hsia et al. | 206/711 |
| 6,056,123 A | * | 5/2000 | Niemirowski et al. | 206/711 |
| 6,193,068 B1 | | 2/2001 | Lewis et al. | |
| 6,234,316 B1 | | 5/2001 | Hsieh et al. | |
| 6,247,597 B1 | * | 6/2001 | Sato | 206/710 |
| 6,286,684 B1 | | 9/2001 | Brooks et al. | |
| 6,491,177 B1 | * | 12/2002 | Hyobu | 220/4.01 |
| 6,564,946 B2 | * | 5/2003 | Lewis et al. | 206/710 |

FOREIGN PATENT DOCUMENTS

FR          2819794          7/2002

* cited by examiner

*Primary Examiner*—Kurt Fernstrom
(74) *Attorney, Agent, or Firm*—Carlson, Gaskey & Olds

(57) **ABSTRACT**

A container for packaging items such as semiconductor wafers has a restraining portion with a changeable dimension at an open end that facilitates using conventional loading techniques while also more securely containing the items to avoid undesirable movement of the items in the container. In one example embodiment, the restraining portion includes a sidewall portion that has a first, nominal inside dimension at one end. A second end of the sidewall portion has a second, greater inside dimension at an open end. Another member of the container cooperates with the sidewall portion to change the inside dimension at the open end from the second, greater dimension to the first, nominal dimension. The nominal dimension is selected to correspond to an exterior dimension of the items to be contained within the package so that the container maintains the items in a secure alignment that eliminates lateral movement of the items once the container is secured.

**17 Claims, 4 Drawing Sheets**





*Fig-1*

*Fig-2*



*Fig-3*

*Fig-4*



*Fig-5*

*Fig-6*



US 6,988,620 B2

**1**

# CONTAINER WITH AN ADJUSTABLE INSIDE DIMENSION THAT RESTRICTS MOVEMENT OF ITEMS WITHIN THE CONTAINER

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 60/408,850, which was filed on Sep. 6, 2002.

## FIELD OF THE INVENTION

This invention generally relates to containers for packaging items such as semiconductor wafers. More particularly, this invention relates to containers having an adjustable inside dimension that restricts movement of the contents within the container.

## DESCRIPTION OF THE RELATED ART

A variety of containers are available for packaging various items during shipping and handling. Depending on the nature of the items, container designs vary. In the case of semiconductor wafers, for example, packaging must securely contain the items to avoid damage during shipping and handling. There must be adequate cushion to absorb impacts. The wafers also must be securely contained to avoid relative movement between the wafers. Regardless of the cushioning approach used, lateral movement between the wafers must be minimized (and ideally is eliminated) to ensure the integrity of the wafers throughout handling and shipping.

A difficulty is introduced by the conventional manner in which containers are filled with wafers. Manual or semi-automated loading techniques require a container having an inside dimension that is greater than the outside dimension of the wafers to facilitate insertion of the wafers into the container. There necessarily is a gap between the inside of the container and the outside of the wafers that eventually allows for lateral movement of the wafers within the container.

One approach at minimizing such movement has been to include a plurality of foam cushions within the container to axially restrict wafer movement and to apply pressure that tends to resist lateral movement. Such arrangements, however, have proven ineffective under many circumstances.

There is a need for an improved container that more securely and reliably maintains delicate items, such as semiconductor wafers, in a desired alignment and secure position within the container throughout shipping and handling. This invention addresses that need while avoiding the shortcomings and drawbacks of the prior art.

## SUMMARY OF THE INVENTION

In general terms, this invention is a container for packaging items such as semiconductor wafers that eliminates undesirable movement of the items within the container.

One example container designed according to this invention includes a first member that has an endwall. A sidewall portion extends from the endwall. The sidewall portion has a nominal inside dimension adjacent the endwall. The nominal inside dimension corresponds to an outside dimension of the items to be placed within the container. The sidewall portion has a greater inside dimension at a second end distal from the endwall. The larger dimension at the distal end facilitates inserting the items into the container. A second

**2**

member cooperates with the sidewall portion of the first member to establish the nominal dimension at the second end after the items are loaded. The cooperation between the first and second members establishes a secure containment of the items that eliminates undesirable movement of the items once they are securely maintained within the container.

In one example, the sidewall portion is at least partially moveable so that the distal end of the sidewall portion moves between a first position corresponding to the larger dimension and a second position corresponding to the nominal dimension. The second member in one example comprises a sidewall that is received around an outside of the first member sidewall to draw the distal ends inward to establish the nominal dimension at the distal end. In a preferred arrangement, the first member sidewall is drawn into the position where the nominal dimension exists at both ends of the sidewall portion simultaneous with closing the container.

The various features and advantages of this invention will become apparent to those skilled in the art from the following detailed description of the currently preferred embodiment. The drawings that accompany the detailed description can be briefly described as follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective, exploded view diagrammatically illustrating an example container designed according to this invention.

FIG. 2 is a perspective illustration of the portion of the embodiment of FIG. 1.

FIG. 3 is an elevational view of a selected portion of the embodiment of FIG. 1 when the container is in a closed condition.

FIG. 4 is a cross-sectional illustration showing the embodiment of FIG. 1 in a loaded and closed condition.

FIG. 5 is a partial, cross-sectional illustration showing cooperation between portions of the embodiment of FIG. 1 as the container is being closed.

FIG. 6 is an elevational view of a selected portion of the embodiment of FIG. 1.

FIG. 7 is a cross-sectional illustration of an alternative embodiment of a container designed according to this invention.

FIG. 8A is an elevational view of selected portions of an alternative embodiment in a first condition.

FIG. 8B is an elevational view of the embodiment of FIG. 8A in a second condition.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 diagrammatically illustrates a container assembly **20**. A first member **22** cooperates with a second member **24** to securely package and contain a plurality of items **26**, which are semiconductor wafers in this example. Packaging cushions **28** are provided on opposite ends of the stack of wafers **26** to cushion the wafers within the container in a conventional manner.

The first member **22** is a bottom or base of the container in this illustration. The base **22** includes an endwall **30** that establishes one axial end of the container **20**. A sidewall portion **32** extends from the endwall **30**. In this example, the sidewall portion **32** comprises a plurality of extensions **34**.

The sidewall portion **32** has a first, nominal dimension (i.e., diameter) at an end **36** of the sidewall portion **32**

US 6,988,620 B2

3

adjacent the endwall **30**. The inside dimension preferably is set so that it corresponds to an outside dimension of the wafers **26** that are received within the container **20**. A distal end **38** of the sidewall portion **32** has a second, greater inside dimension (i.e., diameter). The larger dimension at the distal, open end of the sidewall portion **32** facilitates inserting the wafers **26** and packaging cushions **28** into the container using conventional loading techniques.

The second member **24** is a top or lid portion in this example. The second member **24** includes an endwall **40** that establishes an opposite axial end of the container **20**. FIG. 2 shows the second member **24** from an opposite perspective as that in FIG. 1. As best appreciated from FIG. 2, a sidewall portion **42** extends away from the endwall **40**. The sidewall portion **42** cooperates with the sidewall portion **32** to provide a restraining portion of the container **20** that restrains or contains the wafers **26** (or whatever items) that are placed within the container **20**.

As best appreciated from FIGS. 4 and 5, as the container **20** is closed (i.e., the first and second members **22** and **24** are brought together), the sidewall portion **42** is received about the outside of the sidewall portion **32**. To facilitate the insertion of the sidewall portion **32** within the inside of the sidewall portion **42**, the sidewall portion **42** includes a chamfered edge **44**. A correspondingly chamfered edge **46** preferably is provided near the distal end **38** of the extensions **34**.

The illustrated example includes closure assisting members **48** extending away from the endwall **42** that have a larger inside dimension than the chamfered edge **44** to facilitate gathering in any extensions **34** that may be situated such that it is difficult to capture them within the sidewall portion **42**.

As best appreciated from FIG. 5, as the first and second members **22** and **24** are brought together, the example extensions **34** at least partially move relative to the endwall **30** such that the distal ends **38** move from a first position corresponding to the larger dimension at the open end to a second position corresponding to the nominal position at the open end (FIG. 4).

The illustrated example includes a hinge portion **50** adjacent the end **36** of the sidewall portion **32**. Each hinge portion **50** allows the corresponding extension **34** to move responsive to the container being closed as schematically shown by the arrow **52**.

Once the container is closed (FIG. 4) the same, nominal inside dimension (i.e., diameter) is provided at the end **38** and the end **36** of the sidewall portion **32**. By appropriately sizing the nominal inside dimension, the restraining portion of the container absolutely restricts the items **26** and prevent any relative lateral movement between them. Once the vertical space between the endwalls **30** and **40** is appropriately filled and the container **20** is closed, there is no possible movement of the wafers **26** relative to each other during shipping or handling. Accordingly, the inventive container eliminates any undesirable movement of the wafers **26** during shipping and handling yet accommodates conventional loading techniques.

In this example container, there are locking members **60** that secure the first member **22** and the second member **24** together. A second set of locking members **62** are provided at the corners not occupied by the locking members **60**. Each of the locking members **60, 62** extends from the endwall **30** of the first member **22**. The locking members **60** include tab portion **64** at the ends, which are different than tab portions **66** provided at the ends of the locking members **62**. The tab

4

portions **64** and **66** are received within receiver openings **70** formed in the second member **24** to lock the container closed.

The difference between the tab portions **64** and **66** result from the molding technique used to make the example embodiment. As best appreciated from FIG. 6, a mold opening **72** exists in the endwall **30** of the first member **22** adjacent each locking member **60**, which is used to facilitate forming the locking members. The openings **72** also are used in conventional machinery to locate or position the first member **22** for loading wafers **26** into the container. Conventional containers and conventional loading machinery use such openings for locating and positioning the container as needed.

The inventive arrangement in this example includes two additional locking members **62**, which are adjacent openings **72'**. The openings **72'** are at least partially blocked by a cross member **74**. Conventional locating or positioning machinery relies upon only two openings in the endwall **30**. The cross members **74** prevent any misalignment or improper positioning because the machinery will not be able to use the openings **72'** as the locating openings.

The example arrangement provides a more secure closure by having four locking members **60, 62** yet still provides the locating function or feature of the openings **72** in the endwall **30** of the first member **22**.

Another feature of the example embodiment is that the first and second members have an exterior surface that provides a more closed appearance compared to conventional designs. The second member **24** includes a side surface **80** with extensions **82**. When the first and second members **22** and **24** are secured together, the extensions **82** are received through slots **84** on the first member **22**. A side surface **86** on the first member extends in a direction to meet the side surface **80** of the second member **24**. The illustrated example includes a tongue-in-groove arrangement where a tongue portion **88** on the side surface **86** is received within a groove portion **90** on the side surface **80**. This arrangement provides for a better closure mechanism to further ensure the security of the items packaged within a container.

Another feature is best appreciated from FIG. 4 where the container includes impact-absorbing "cushions" that are spaced away from the physical structure of the container that holds the wafers **26** in place (i.e., the wafer-restraining portion). The second member **24** includes a raised portion **92** while the first member **22** includes an extension portion **94**. The outward surfaces of the portions **92** and **94** are axially spaced from the endwalls **30** and **40** so that when the container **20** is dropped or otherwise encounters a hard surface, the outer portions **92** and **94** (or the side surfaces **80** and **86**, depending on the direction of impact) absorb at least some of the impact, which provides further protection for the wafers **26** within a container designed according to this invention.

Another feature of the example embodiment is shown in FIG. 4 where the extensions **94** have an inner, angled surface **96** that is adapted to cooperate with the extensions **98** on the first members **24**. This provides a partially nested, stacking arrangement as can be appreciated from the upper right portion of FIG. 4. This facilitates stacking a plurality of the containers **20** in a convenient manner.

Other container embodiments are within the scope of this invention that include alternative ways of achieving the change in inside dimension at the open end of the restraining portion after the items have been loaded into the container.

FIG. 7 illustrates one example where the sidewall portion **34'** on the first member **22'** does not move as the container

US 6,988,620 B2

5

is closed. In this example, the sidewall portion **34'** is rigid and remains stationary under all conditions. The nominal dimension of the interior defined by the sidewall portion **34'** exists at the end **36'** adjacent the endwall **30'** while the larger dimension remains at the open end **38'**.

A cooperating reducing portion **100**, which extends from the endwall **40'** of the second member **24'** in this example, provides the nominal inside dimension on the inside at the distal end **38'** when the container is closed. In this example, the reducing portion **100** has an interior surface **102** that includes the nominal inside dimension. An exterior surface **104** is at an oblique angle relative to the endwall **40'**. An interior surface **106** of the sidewall portion **34'** is at a corresponding oblique angle relative to the endwall **30'**.

As can be appreciated from the drawing, once the container is closed, the reducing portion **100** of the second member **24'** is at least partially received within the sidewall portion **34'**. The inner surface **102** is received against the exterior of corresponding ones of the wafers within the container (not illustrated in FIG. 7). The surfaces **106** and **104** cooperate to provide a secure lateral arrangement between the sidewall portion **34'** and the reducing portion **100**. The sidewall portion **34'** and the reducing portion **100** cooperate to provide the nominal inside dimension at the distal end **38'** as the container is closed.

In another example, the reducing portion **100** is a separate ring that is received at least partially within the sidewall portion **34'** at an appropriate time during the assembly procedure.

Another example arrangement is shown in FIGS. **8A** and **8B** where a reducing portion that comprises a band member **120** cooperates with the extensions **34** to draw them into the position where the extensions **34** have the nominal inside dimension along their entire length (i.e., where the distal ends **38** are drawn into the position to establish the nominal inside dimension at the distal, open end of the sidewall portion **34**). In this example, the extensions **34** operate similar to those shown in FIGS. **1–5**. The band member **120** is positioned around the extensions **34** and then tightened at an appropriate time to draw the distal end of the extensions **34** into position so that the extensions **34** engage the exterior of the wafers **26** as shown in FIG. **8**. Accordingly, this example embodiment provides another arrangement where there is no possibility for lateral movement of the wafers **26** once the package is secured.

In one example, the band member **120** comprises a zip tie. In another example, the band member **120** comprises a strap. In another example, the band member **120** comprises tape.

As can be appreciated, this invention provides a container that securely maintains items such as semiconductor wafers in a desired alignment that restricts any movement of the items once the container is appropriately secured. By including a change in the dimension at the open end of the restraining portion of the container, the inventive arrangement allows for using conventional loading techniques and still provides a far-advanced securing arrangement to eliminate undesirable movement of items within a container.

The preceding description is exemplary rather than limiting in nature. Variations and modifications to the disclosed examples may become apparent to those skilled in the art that do not necessarily depart from the essence of this invention. The scope of legal protection given to this invention can only be determined by studying the following claims.

We claim:

**1**. A container for handling items such as wafers, comprising:

6

a first member having an endwall and a sidewall portion extending from the endwall, the sidewall portion having a nominal inside dimension adjacent the endwall and a greater inside dimension at a second end distal from the endwall when the container is in a first condition; and

a second member that cooperates with the sidewall portion to establish the nominal dimension at the second end when the container is in a second condition, wherein the second member comprises a band member that is received about an exterior of the first member sidewall portion, to move the distal end of the sidewall portion inward.

**2**. The container of claim **1**, wherein the sidewall portion is at least partially moveable such that at least the distal end is moveable between a first position corresponding to the greater inside dimension at the distal end and a second position corresponding to the nominal dimension at the distal end.

**3**. The container of claim **2**, wherein the sidewall portion comprises a plurality of extensions with a hinged portion associated with each extension, at least a portion of each extension moving about the hinged portion between the first and second positions.

**4**. The container of claim **3**, wherein the hinged portion is adjacent the endwall.

**5**. The container of claim **3**, wherein the extensions are arranged in a generally circular pattern.

**6**. A container for handling items such as wafers, comprising:

a first member having an endwall and a sidewall portion extending from the endwall, the sidewall portion having a nominal inside dimension adjacent the endwall and a greater inside dimension at a second end distal from the endwall when the container is in a first condition; and

a second member that cooperates with the sidewall portion to establish the nominal dimension at the second end when the container is in a second condition, wherein the first member sidewall portion has an inside surface that is at an oblique angle relative to the endwall and the second member has an outside surface that is received at least partially against the obliquely angled surface, the second member having an inside dimension corresponding to the nominal inside dimension of the sidewall portion.

**7**. The container of claim **6**, wherein the second member outside surface is at the same oblique angle relative to the first member endwall when the second member is received by the first member sidewall portion.

**8**. The container of claim **6**, wherein the sidewall portion is at least partially continuous and circular.

**9**. A container, comprising;

a first endwall;

a restraining portion having one end near the first endwall, the restraining portion establishing a first inside dimension near the first endwall and having a second, larger inside dimension near a second end of the restraining portion that is spaced from the first endwall when the container is in a first condition;

a reducing portion that cooperates with the restraining portion to reduce the inside dimension near the second end from the second dimension to the first dimension; and

a second endwall near the second end of the restraining portion.

US 6,988,620 B2

7

**10**. The container of claim **9**, wherein the restraining portion is at least partially moveable such that the second end has the second inside dimension in a first position and the first inside dimension in a second position.

**11**. The container of claim **9**, wherein the restraining portion and the first endwall are integrally formed from a single piece of plastic.

**12**. The container of claim **11**, wherein the reducing portion and the second endwall are integrally formed from a single piece of plastic.

**13**. The container of claim **9**, including locking members extending away from the first endwall and receivers associated with the second endwall, the locking members having ends that are at least partially received by the receivers such that the first endwall and the second endwall are spaced apart and locked together with the restraining portion extending across at least part of the spacing between the endwalls.

**14**. The container of claim **13**, wherein the first endwall is generally rectangular with the locking members near each of the four corners of the first endwall and the first endwall has

8

openings adjacent the locking members, at least two of the openings being partially blocked by a cross member.

**15**. The container of claim **9**, wherein the restraining portion comprises a plurality of extensions having one end adjacent the first endwall, each extension being at least partially moveable between a first position corresponding to the first dimension at the second end and a second position corresponding to the second dimension at the second end and wherein the cooperating reducing portion extends from the second endwall and moves the extensions into the first position as the first endwall and the second endwall are moved toward each other.

**16**. The container of claim **9**, wherein the reducing portion comprises a sidewall that is received at least partially about an exterior of the restraining portion, the sidewall moving the second end of the restraining portion inward as the sidewall is received about the restraining portion.

**17**. The container of claim **16**, wherein the second endwall supports the sidewall.

* * * * *

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 12–01341 JGB (SPx)** | Date | January 13, 2015 |
| Title | ***Texchem Advanced Products, Inc. SDN. BHD v. e.PAK International, Inc.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Findings of Fact and Conclusions of Law (IN CHAMBERS)**

Plaintiff Texchem Advanced Products, Inc. ("TXAP") sought a declaratory judgment regarding the validity of Defendant e.PAK International, Inc.'s ("e.PAK") patent.  The Court held a 6-day bench trial from August 5, 2014 to August 14, 2014 to determine (1) whether claims 13 and 14 of e.PAK's patent are invalid as obvious, see 35 U.S.C. § 103; and (2) if those claims are valid, whether TXAP's device infringes—literally or under the doctrine of equivalents—one or both of them.  After considering the evidence presented at trial, and the parties' arguments and post-trial submissions, the Court finds the remaining claims of e.PAK's patent invalid as obvious.  The findings of fact and conclusions of law that follow explain the Court's judgment. See In re Kahn, 441 F. 3d 977, 988 (Fed. Cir. 2006); Fed. R. Civ. P. 52(a); Local R. 52–3.

## I.  BACKGROUND

### A.    Factual Background

Silicon wafers (thin cylindrical slices of nearly pure silicon used to make integrated circuits) are shipped in special containers because the wafers are costly and delicate.  Texas Instruments ("TI," not a party to this litigation), e.PAK, and TXAP all make superficially similar containers designed to protect silicon wafers during shipping.  TI and e.PAK hold patents on their containers.  TI's ′695 patent was issued in 2002 and e.PAK's ′620 patent was issued in

2006.[1]  The ′812 and ′695 patents are prior art to e.PAK's ′620 patent.  TXAP's container is not yet patented, but the United States Patent and Trademark Office ("USPTO") sent TXAP a Notice of Allowance in June 2013 for its container.

The e.PAK and TXAP containers are both made out of injection-molded plastic and resemble each other at a general level.  The containers separate into two halves ("endwalls") that are roughly square in shape.  The bottom half ("first endwall") of each container has a round space where the wafers are stacked one on top of another.  The border of that round space is defined by a thin plastic wall ("restraining portion") that protrudes upward from the bottom half.  The containers' restraining portions are built slightly differently.  The top half ("second endwall") also has protrusions, coming downward ("reducing portion").  When the top and bottom halves of the containers connect, the protrusions from the top articulate with the protrusions from the bottom, slightly constricting the circumference of the circle.  The circular wall's constriction tightens the fit around the stacked wafers, holding them (more) securely in place.[2]  This slight tightening around the wafers is what makes e.PAK and TXAP containers special—when held snugly in place the wafers are at a reduced risk of damage while in transit, a trait desired by wafer manufacturers and their customers.

The top and bottom halves of the e.PAK and TXAP containers are held together by latches ("locking members").[3]  One latch extends from each corner of the container's first endwall, and clips into a corresponding hole ("receiving member") in the second endwall when the box is closed.  Adjacent to each latch on the first endwall is a small hole (four holes total per container).  Those holes are vestiges of the process by which the latches are built into the bottom halves of the containers.  On the e.PAK container, a small piece of plastic ("cross member") sits completely across two of the holes on opposite corners of the container.  Similarly, on the TXAP container there is a small tab partly obstructing two holes on opposite corners of the first

---

[1] An additional container, U.S. Patent No. 5,909,812, is important to this litigation.  The ′812 container, which patent issued in 1999, is used to ship "lead frames" rather than silicon wafers, but it is considered here as prior art to e.PAK's container.  All the patents are referred to by their last three digits, as is customary; but the full patent numbers are: 5,909,812; 6,341,695; and 6,988,620.

[2] In the language of the patents, this articulation and reduction in circumference happens when the container is in its "second condition," which means closed; the "first position" means the container is open.

[3] TI's ′695 container has two latches, on opposite corners of the first endwall.  e.PAK's ′620 container and the TXAP container each have four latches, one on each corner.  TI's ′812 container does not have latches, instead it uses a technique called "friction fit" to hold the halves together—think of tupperware or a pen's cap.  Whether through latches or friction fit, the quality of having the top stay put once the container is closed is called "releasabl[e] securab[ility]" by the patents.

endwall.  The tabs and cross members exist to orient the containers in the machines that load the wafers into the boxes.[4]

## B.    Procedural History

This case arose because e.PAK thought TXAP infringed the patent on e.PAK's container. TXAP thought otherwise, and sought a declaratory judgment from the Court to that effect.  On August 12, 2013, the Court granted TXAP partial summary judgment in an order that resolved most of the claims and counterclaims in this litigation.  (See Summ. J. Op., Doc. No. 84.)  That order held, in most relevant part, that the ′812 container anticipated all the elements in claim 9 of e.PAK's ′620 patent.[5]

Left unresolved by the summary judgment opinion was the validity of claims 13 and 14 of the ′620 patent.  Claim 13 adds four locking members (the latches) to the container described by claim 9, and claim 14 adds two cross members to the container in claim 13.  If those two claims, or either of them, are valid, then the Court must decide if TXAP's container infringes e.PAK's ′620 patent, literally or by the doctrine of equivalents.

## II. FINDINGS OF FACT[6]

1.    Silicon wafers used to make circuitry are thin and delicate, and are shipped in special boxes for protection.  The wafers are stacked vertically in the containers with a sheet of plastic separator placed between each wafer.  TI found that wafers were sustaining damage in transit due to the plastic separator's shearing.  That shearing was caused, in part, by side-to-side movement of the wafers.  (Tr. 9–11.)

---

[4] The drawings appended to this order show various embodiments of the e.PAK ′620 container. The locking members are represented by numbers 60 and 64 in "Figure 1," and the number 74 points to the cross members in "Figure 6," which is a view of the bottom of the first endwall.

[5] The summary judgment order also invalidated claims 10–12 and 15–17 of e.PAK's ′620 patent, all of which depend on claim 9.  Claim 9 describes:

> A container, comprising; a first endwall; a restraining portion having one end near the first endwall, the restraining portion establishing a first inside dimension near the first endwall and having a second, larger inside dimension near a second end of the restraining portion that is spaced from the first endwall when the container is in a first condition; a reducing portion that cooperates with the restraining portion to reduce the inside dimension near the second end from the second dimension to the first dimension; and a second endwall near the second end of the restraining portion.

[6] All citations are to either the full trial transcript or to exhibits received into evidence as numbered by the parties' joint amended exhibit list.  (See Doc. No. 103.)

---

2.     TI asked e.PAK to help it solve the shearing problem in 1999.  (Tr. 13.)  e.PAK's solution, developed mainly by engineers Jim Haggard and Jim Thomas, focused on restricting the lateral movement of the wafers inside the containers during shipping, and resulted in the plastic container described by U.S. Patent No. 6,988,620.  (Tr. 12–13.)  Claim 9 of e.PAK's ′620 patent describes a container that comprises two distinct halves, and when closed lessens the lateral movement of the wafers stacked inside by reducing the circumference of the circular restraining wall which hugs the wafers.  (Ex. 1.)  e.PAK submitted the container to the USPTO in September 2002, and received the ′620 patent in January 2006.  The ′620 container comes in at least two sizes, one holds 200-millimeter wafers and one holds 300-millimeter wafers.  (Exs. 18, 19.)

3.     TXAP designs and markets a wafer shipper, made of two distinct halves, that restricts lateral movement of silicon wafers during shipping by reducing the circumference of the circular restraining wall which hugs the wafers stacked inside the container.  TXAP started selling its containers in the early part of 2011 (before that time e.PAK had the market for "total containment" wafer shippers to itself).  (Tr. 224–225.)  The TXAP box comes in at least two sizes, one holds 200-millimeter wafers and one holds 300-millimeter wafers.  (Exs. 5–7.)

4.     The e.PAK ′620 container and the TXAP container are nearly identical in function, if not form.

5.     A person of ordinary skill in the art of wafer-shipper design has an undergraduate degree in mechanical engineering or its equivalent, and has worked with or as a design engineer in the field of injection-molded plastic containers for several years.  This person has both technical skill and knowledge as well as the practical and creative problem-solving abilities inherent in the engineering field.  Furthermore, the person of ordinary skill in this case possesses domain knowledge of the current state of the art—that is, she knows about her competitors' containers and devices.

6.     U.S. Patent No. 5,909,812 to Thibadeau discloses a container for shipping lead frames.  (Ex. 76.)  The ′812 container is a rectangular box made of two halves in which lead frames are stacked vertically.  When closed, the ′812 container's sides tip inward (creating a tighter fit around the lead frames) and reduce the lateral movement of the lead frames during shipping.  The ′812 container's halves are held together at a consistent distance in a "releasably secure" fashion by friction fit, not by clips or latches.  The ′812 container is prior art to the ′620 box.

7.     U.S. Patent No. 6,341,695 to Lewis discloses a container for shipping silicon wafers; the ′695 patent is owned by TI.  (Ex. 77.)  The ′695 container is a rectangular box with two halves in which the wafers are stacked vertically.  A circular wall holds the wafers loosely in place, but the ′695 container's wall does not move to create a tighter fit when the container is closed—unlike the e.PAK ′620 and TXAP containers.  The halves of the ′695 box are held together by two latches.  The latches are molded into the first endwall on opposite corners, and

clip into corresponding receiving members on the second endwall. The latches produce a releasably secure fit, and hold the endwalls apart at a consistent distance. The ′695 container is prior art to the ′620 box.

8.      e.PAK's ′620 container uses four latches that are molded into the first endwall and clip into receiving members on the second endwall to close the container in a releasably secure manner. (Ex. 1.) The latches are located at the four corners of the first endwall and hold the endwalls apart at a consistent distance. Claim 13 of the ′620 patent combines the container described by claim 9 of the ′620 patent with four latches. (Ex. 1.)

9.      Using latches as a mechanism to secure or close a plastic container is well known in the art of making containers out of injection-molded plastic. (Tr. 67–70; 562–563.) Latches are cheap to add to a container and provide a stable fit. Latches are prominently featured in many textbooks on container design, and a person of ordinary skill in the art would recognize latches as an option to keep a container like the ′620 box shut with a consistent distance between the halves. (Tr. 471–474.)

10.     e.PAK licensed TI containers (including the ′695 container) in or around 2002, before it designed and marketed its ′620 container, and e.PAK engineers had previously worked with TI engineers on various container projects. (Tr. 64–68; 227–228.)

11.     The TXAP container also has four latches, situated on the four corners of the first endwall. Those latches clip into associated receiving members on the second endwall to provide a releasably secure closure. (Exs. 5–7.)

12.     One way to test the security and efficacy of the wafer shippers is to conduct a "drop test." A drop test is just what it sounds like—the tester loads the container with wafers, drops it from a predetermined height, then opens the box and assesses any damage. Latches provide a more effective closing mechanism on wafer-shippers like the ones at issue because the latches hold the endwalls apart at a consistent distance and require distinct lateral pressure to unlatch. (Tr. 571, 573.) In contrast, friction fit can either be so tight (to guarantee the endwalls do not separate) that it is difficult to open the container, or so loose (to allow ease of subsequent opening) that the halves could easily separate if the container is dropped. Latches provide more security than friction fit in the context of wafer-shipping containers, with little or no downside. (Tr. 574–75.)

13.     On a container like the ′695 box, with only two latches, the endwalls can separate slightly at the unlatched corners even when the container is shut. Using four latches instead of two, one on each corner of the container, provides a generally more secure fit. (Tr. 37–38; 474.)

14.     On the first endwall of the ′695 container, just inside the latches, are two small rectangular holes. Those holes result from the container's manufacturing process; in order to create the latches something must extend upward to mold the latch's clip. (Tr. 35, 137.) The two holes on opposing corners of the first endwall are used by wafer manufacturers to align the

container in the machine that loads the wafers into the box. It is commonly known in the wafer-shipping industry that those two holes serve that alignment purpose on boxes used to ship 200-millimeter sized wafers. (Tr. 34–37; 140–141.)

15.     e.PAK's ′620 container has four latches, so it ends up with four small holes in the first endwall, rather than two. (Tr. 31.) e.PAK and its engineers knew TI's (and other manufacturers') machinery is designed to work with containers that only have two small holes (like TI's ′695 box). (Tr. 36–37.) In order to make the ′620 box fit correctly into its customers' machinery, e.PAK added two small, flat, square-shaped pieces of plastic to the endwall's design. (Tr. 34–38.) Those pieces of plastic are called cross members, and they sit in the middle of two of the holes on opposite corners on the first endwall. The cross members exist solely so the container will properly orient itself in the wafer-loading machines. (Tr. 34–38.)

16.     Claim 14 of e.PAK's ′620 patent adds the cross members to the container described by claim 13 (which is the container from claim 9 with latches). (Ex. 1.)

17.     e.PAK's expert explained that "[a] person of ordinary skill in the art who was properly designing a container would also take into consideration how that container is going to be handled by the machinery and make sure that the design of the container's [sic] compatible with the machinery." (Tr. 487.) Jim Haggard, e.PAK's lead designer of the ′620 box, knew the automated machinery used to load the wafer shippers by e.PAK's customers used the two holes in the base of the ′695 container for alignment. (Tr. 140–141.) Haggard also knew that the four holes on the e.PAK container would cause alignment problems for e.PAK's customers. (Id.)

18.     The 200-millimeter TXAP containers also have four holes on the first endwall because they have four latches. (Ex. 5, 7.) Rather than a cross member that extends all the way across the hole, the TXAP box uses small tabs that extend partially across two holes on opposite corners of the base. (Exs. 5, 7.) The sole purpose of the tabs on the TXAP container is to properly orient the container in the manufacturers' wafer-loading machines. (Tr. 624.)

### III. CONCLUSIONS OF LAW

**A.     Obviousness**

**1.     Legal standard**

An issued patent is presumed valid, see 35 U.S.C. § 282, but that presumption does not hold if the "differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103; accord KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398 (2007); Hotchkiss v. Greenwood, 52 U.S. 248 (1851). Obviousness is a defense against the presumption of validity, and the party asserting that defense must prove it by clear and convincing evidence. See

Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238 (2011) (citing American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350 (Fed. Cir. 1984)).

KSR explains that § 103 should be interpreted "expansive[ly] and flexibl[y]." KSR, 550 U.S. at 415. A claimed invention that combines elements of prior art is obvious if the "improvement is [not] more than [a] predictable use of prior art elements according to their established functions." Id. at 417. "[A] court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ," but "it can be important to identify a reason" for the new combination. Id. at 418. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." Id. at 420. KSR's flexible approach to assessing obviousness "not only permits, but requires, consideration of common knowledge and common sense." Randall Mfg. v. Rea, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (emphasis in original).

"Obviousness is a question of law, based on underlying factual findings." K/S Himpp v. Hear-Wear Techs., LLC, 751 F.3d 1362, 1364 (Fed. Cir. 2014) (citing KSR, 550 U.S. at 427). "The underlying factual inquiries include: (1) the scope and content of the prior art, (2) the differences between prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." Wyers v. Master Lock Co., 616 F.3d 1231, 1237 (citing Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966)).

Only the scope and content of analogous prior art bear on the obviousness of a patent. Wyers, 616 F.3d at 1237. Prior art is analogous if (1) "the art is from the same field of endeavor, regardless of the problem addressed," or (2) the "reference is not within the field of the inventor's endeavor, [but] the reference still is reasonably pertinent to the particular problem with which the inventor is involved." Id. (quoting In re Clay, 966 F.2d 656, 658–59 (Fed. Cir. 1992)). Referenced art from outside the field of endeavor is still "reasonably pertinent" if it "logically would have commended itself to an inventor's attention in considering his problem." In re Klein, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (quoting Clay, 966 F.2d at 659); accord KSR, 550 U.S. at 420 ("Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."). Taken together, section 103's case law favors a broad interpretation of analogous art. Wyers, 616 F.3d at 1238.

The level of ordinary skill in the art is determined by looking to: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) educational level of active workers in the field. Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254, 1256 (Fed. Cir. 2007). Those factors are meant to guide the court's decision and are not exhaustive. Id. Additionally, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." KSR, 550 U.S. at 421.

---

Although <u>KSR</u> provides a flexible approach to obviousness, a core factual finding that a claim's limitation was "well-known" to a person of ordinary skill in the art must be supported by record evidence. <u>K/S Himpp</u>, 751 F.3d at 1365. Expert testimony is not necessary if the "references and the invention are easily understandable." <u>Wyers</u>, 616 F.3d at 1242.

**2.    Application**

1.      Claim 13 to e.PAK's ′620 container is invalid because it would have been obvious to a person of ordinary skill in the art to use four latches as the closing mechanism on a plastic wafer shipper at the time e.PAK designed the ′620 box. <u>See</u> 35 U.S.C. § 103; <u>KSR</u>, 550 U.S. at 415–16.

2.      Claim 13 adds four latches to e.PAK's container. A person of ordinary skill in the art would have been aware that latches were a common locking device for plastic containers. First, she would consider latches because they are prevalent in academic texts on the subject. Second, she would have been aware of the ′695 container through her work in the field. That container used two latches to create a releasably secure fit on a nearly identical wafer shipper. The ′620 box takes the latch-closure concept from the ′695 box (that e.PAK was licensing at the time), and augments it with two more latches. Using four latches created a more secure and thorough closure, so it would have been obvious for a skilled engineer to try while seeking to build the ultimate containment system.

3.      e.PAK failed to present evidence of any secondary considerations that would overcome the extraordinarily strong evidence of obviousness in this case. Although e.PAK presented evidence of commercial success at trial, it failed to show that success was not merely a result of the discontinuation of its license of TI's ′620 container; that is, e.PAK was selling the same amount of containers to TI, but was now selling e.PAK containers instead of TI-licensed containers. Further, the evidence does not show that using four latches rather than two solved a long unmet need in the industry.

4.      Claim 14 to e.PAK's ′620 container is invalid because it would have been obvious to a person of ordinary skill in the art to block two of the four holes on the first endwall to promote compatibility with e.PAK's customers' machinery. <u>See</u> 35 U.S.C. § 103; <u>KSR</u>, 550 U.S. at 415–16.

5.      Jim Haggard (e.PAK's lead designer of the ′620 box) knew that the two extra holes on the first endwall of e.PAK's container would cause alignment problems for e.PAK's customers. Although obviousness relies on an objective standard, Haggard's awareness of the problem and solution provides evidence that a person of ordinary skill in the art would also be aware of the problem and the solution.

6.      A person of ordinary skill in the art would have known that the ′695 container had two latches, and thus two holes on its first endwall. She would also have known that those two holes were used to align the box in the automated machinery used by the wafer manufacturers.

Accordingly, a person of ordinary skill in the art would have designed a new container <u>to conform to that pre-existing standard</u>.

      7.      e.PAK's expert testified that a person of ordinary skill in the art would have been aware of the potential alignment problem and would try to solve it. Inherent in that general awareness and motivation is the solution e.PAK used to block the holes in the endwall. The small plastic cross members' <u>only</u> purpose is to promote alignment in the loading machinery. As such, the cross members in claim 14 were not an innovation at all—they maintained the status quo in the art of wafer shippers by seeking to mirror exactly the function of the holes in the first endwall of the ′695 container. Because it was within the ability of a person of ordinary skill in the art at the time of the ′620 container's design to obstruct two of the first endwall's holes so the container would fit into existing machinery, claim 14 was obvious.

      8.      Any secondary considerations cut against e.PAK as well. There was no long felt need to add two cross members to the claim 14 container. In fact, any need to do so was created by e.PAK's use of four latches rather than two.

### 3.    Infringement

      9.      Because both claims 13 and 14 of the ′620 patent are invalid as obvious, TXAP could not have infringed them.

## IV. CONCLUSION

For the reasons stated above, based on the facts found at trial, the court concludes claims 13 and 14 of e.PAK's ′620 patent are invalid as obvious.

---

**APPENDIX**



**A890**

# PROOF OF SERVICE

Pursuant to Fed. R. App. P. 25(d), I hereby certify that on April 24, 2015, I caused the foregoing Corrected Brief of Appellant e.PAK International Inc. to be electronically filed with the Clerk of Court using the CM/ECF system, and thereby served via CM/ECF on counsel for Appellee.


Dated: April 24, 2015                    /s/ Steven Susser___
                                         Steven Susser

                                         *Counsel for Appellant e.PAK*
                                         *International Inc.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2) because it contains 9,840 words as counted by Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word 2010.


Dated: April 24, 2015                     /s/ Steven Susser___
                                          Steven Susser

                                          *Counsel for Appellant e.PAK*
                                          *International Inc*